J-S06025-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH FLORENTI CESA, JR. | : | |
| | : | |
| Appellant | : | No. 369 WDA 2024 |

Appeal from the Judgment of Sentence Entered October 20, 2023
In the Court of Common Pleas of Elk County Criminal Division at No(s):
CP-24-CR-0000327-2022

BEFORE: PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.: **FILED: May 9, 2025**

Joseph Florenti Cesa, Jr. ("Cesa") appeals from the judgment of sentence imposed following his jury convictions of conspiracy,[1] drug delivery resulting in death, criminal use of communication facility, and possession with intent to deliver a controlled substance[2] ("PWID"), namely heroin. We affirm.

The Commonwealth charged Cesa with the above cited offenses. This matter proceeded to a jury trial, at which the Commonwealth presented the

_____

[1] The trial docket indicates charges of, and Cesa's convictions of, **two** counts of drug delivery resulting in death and **two** counts of PWID, without any reference to conspiracy. Criminal Docket at 2-6. However, the jury's written verdict slip, the jury's announcement of the verdict in open court, and the trial court's written sentencing order all show guilty verdicts on only **one** count each of drug delivery resulting in death and PWID, as well as one count of conspiracy for each offense. **See** Verdict, 8/25/23; **see also** N.T., 8/24/23, at 126; Order, 10/20/23, at 1-2.

[2] 18 Pa.C.S.A. §§ 903(a)(1), 2506(a), 7512(a); 35 P.S. § 780-113(a)(30).

following evidence. On February 1, 2022, Aaron Johnson (the "Victim") was at home with his father. The next morning, the father found the Victim, who had a years-long drug addiction, deceased. At the scene, a Pennsylvania State Police ("PSP") trooper recovered: (1) a piece of notebook paper and a razor blade, both containing a white powdery substance, later tested to be heroin and fentanyl; and (2) a partial white glassine packet, later determined to contain methamphetamine and fentanyl. The trooper also recovered: a hypodermic needle; a piece of foil with burnt residue; a cotton swab;[3] glassine bags; and approximately twelve "different kinds of" "empty stamp bags" — "a common street name for what drug users store their heroin in." N.T., 8/23/23, at 66-68, 78-79. Additionally, the trooper observed "rolled up" pink duct tape and a folded "piece of paper . . . shaped in a box form," but did not collect these because he was not aware of any significance to them. *Id*. at 68, 83. The Victim's mother also testified that the Victim, then approximately thirty-five years old, was friends with Cesa for approximately twenty years.

Officers also obtained the Victim's cell phone, which showed the following evidence. At 2:20 p.m. on February 1, 2022 — the day before the Victim died — the Victim sent his mother a text message, asking for $120 to pay his "DUI lawyer." N.T., 8/23/23, at 179-80. At 2:39 p.m., his mother

---

[3] At trial, the trooper explained that drug users often: (1) "put their drug on top of the foil[,] light the bottom of that foil[, and] inhale the fumes burning off;" and use a cotton swab "as a filter for their syringe when they suck up their drug into the syringe [sic]." N.T., 8/23/23/, at 67, 69.

agreed, and responded that she sent the Victim the money. At 4:38 p.m., the Victim asked for an additional $60 to pay late fees to his lawyer. His mother again agreed.

The Victim's cell phone further showed that on that same day, he transferred cash through the Cash App app as follows: (1) at approximately 3:16 p.m., $120 to "George Washington," an alias used by Alex Weis ("Weis"); and (2) at approximately 6:22 p.m., $60 to Cesa. *Id*. at 99, 120, 185. Weis was the subject "of an ongoing investigation at that time." *Id*. at 99. Additionally, St. Mary's Police Officer Derrick Welsh testified that it was common for people to use Cash App to pay for drugs, "if not more common than cash transactions." *Id*. at 97. Based on this information, the authorities suspected Cesa and Weis were involved in the Victim's death.

On February 3, 2022, Elk County District Attorney's Office Detective Gregg McManus ("Detective McManus") went to Cesa's residence and executed a search warrant for his cell phone. Detective McManus testified to the following. Cesa told the detective that "when he heard that [the Victim] had died, . . . he knew somebody would be coming to talk to him." N.T., 8/23/23, at 171. Cesa "acknowledge[d] providing heroin to [the Victim on the day he died.] He said that the heroin . . . was plain unadulted (sic) heroin," without "anything else in it." *Id*. ("sic" notation in original). Detective McManus asked "if he had any more of that heroin available." *Id*. Cesa replied

that he did, took the detective to the bathroom, retrieved a baggie, and gave it to the detective.

Shortly thereafter, the authorities extracted, from the Victim's cell phone, text messages between him and Cesa, beginning at 3:28 p.m. on February 1, 2022. The Commonwealth presented hard copies of these messages during Detective McManus' testimony. The Victim contacted Cesa first. Cesa asked him if he had "any loot," a slang word for money. N.T., 8/23/23, at 192-93. The Victim stated he had "120," and Cesa replied, "I'll do a thing for that." *Id*. at 192. Detective McManus believed, based on his experience, that these messages indicated a drug transaction, and that $120 was "the general cost for approximately a bundle of heroin," which was ten bags of heroin. *Id*. at 192-95. Cesa messaged the Victim that he was working but could meet on his way home. Later that day, the Victim stated he just spent $60 "turn[ing his] phone back on." *Id*. at 194. Cesa stated, "OK give ya half one then [*sic*]," which Detective McManus interpreted to mean Cesa would give the Victim half a bundle, or five bags, of heroin. *Id*. at 194-95. The Victim then stated, at 5:39 p.m., that he just left his house, and there are several messages, until 6:04 p.m., from both men advising each other of where they were. The next message was at 12:25 a.m. on February 2, 2022, where the Victim texted, "Hey," and Cesa responded, "Hola." *Id*. at 197.

On February 7, 2022, Cesa submitted to a second police interview with Detective McManus at the police station. The detective informed him of the

above messages. At this time, Cesa stated that on the evening of February 1, 2022, Cesa was at Weis' home, and he had known him "for most of his life." N.T., 8/23/23, at 186.

Four months later, on June 20, 2022, Cesa requested to talk to Detective McManus, and submitted to a third, video-recorded interview. Cesa stated the following. Cesa was at Weis' home, where Weis handed him a box, made of paper and wrapped with pink or purple duct tape with lines on it, and asked Cesa to take it to the Victim's house. Detective McManus summarized the interview:

> There was discussion about the drugs that . . . Weis had there. [H]eroin is typically packaged in . . . small one-inch-by one-inch . . . glassine folded almost like a wax paper[.] I had asked [Cesa] if that's how [Weis] had had the heroin packaged, and he indicated that, no, it wasn't. It was just in one big bag he said. It was just the powder was just all together in one big bag, and he would just retrieve the powder from the bag. . . . Cesa said he had some of it and just gave him a small amount.
>
> I . . . asked [Cesa] if he had watched [Weis] put the powder into the box before he gave it to him prior. I asked him if he watched him weigh it out and everything, and he said, No. He said, To be honest, . . . I did not see [Weis] put that in the box. He said, But I'm not stupid or brain dead. I know what it was.

N.T., 8/23/23, at 188-89. Cesa stated that he then left Weis' home, met the Victim at the end of his driveway, gave him the package, and left. Cesa also had "a 20-second phone call with [the Victim] to let him know that he was going to meet him at the end of the driveway." *Id*. at 189.

At trial, Cesa made an oral motion to exclude any testimony by the forensic pathologist, who performed the Victim's autopsy, based on a

toxicology report prepared by someone else. Cesa argued the admission of such evidence would violate the Confrontation Clause, as he could not cross-examine the person who performed the toxicology testing and prepared that report.[4] *Id*. at 111. The trial court denied Cesa's motion, and permitted the evidence under Pa.R.E. 703 (discussed *infra*).

The forensic pathologist, Manjunath Heggere, M.D. ("Dr. Heggere"), then testified as an expert in the field of forensic pathology. He stated the following. He, and generally "all forensic pathologists," routinely rely on toxicology reports in performing his work; it "is a routine part" of his job. N.T., 8/23/23, at 143. The Victim's toxicology report showed the presence of three drugs in his blood, all within the "toxic range": fentanyl, morphine — which can be metabolized from heroin — and mitragynine.[5] *Id*. at 144, 148. Fentanyl was "the most important" and "lethal" drug in this matter, the amount found in the Victim's blood — 32.3 nanograms per mL — "can kill pretty quickly," and it "is very very unlikely" that a person with this amount "will survive." *Id*. at 146-47, 153. This amount of fentanyl alone, without other drugs, "was enough to kill him." *Id*. at 152.

Dr. Heggere also explained that these drugs, including fentanyl alone, can suppress the brainstem and cardiac center, leading to heart and

---

[4] Neither party explained why the toxicologist was unavailable for trial.

[5] Dr. Heggere explained the toxicology report also provided the "therapeutic," "toxic," and "lethal" ranges for each drug. N.T., 8/23/23, at 147.

respiratory failure. N.T., 8/23/23, at 152. Dr. Heggere examined the Victim's organs, and found: (1) both lungs weighed approximately double the normal weight, indicating pulmonary congestion; (2) "the liver was a little big," was congested, and had "some fatty liver;" and (3) "passive congestion of [the] spleen, adrenal glands[,] and kidneys." *Id*. at 144-45. These "typically" occur where there is cardiopulmonary arrest, or heart failure. *Id*. "[M]ost importantly," Dr. Heggere also found edema, or swelling, of the Victim's brain which "typically" occurs in cases of drug overdose. *Id*. at 145.

Dr. Heggere opined, "within a reasonable degree of medical and scientific certainty in [his] field," that that the Victim's cause of death was multi-drug toxicity, or toxicity of the "three combined drugs." *Id*. at 146, 153. On cross-examination, however, Dr. Heggere agreed that he could not say with "certainty that fentanyl alone killed" the Victim. *Id*. at 161.

Cesa did not testify in his own defense, but presented exhibits. The jury found him guilty of drug delivery resulting in death, conspiracy to commit drug delivery resulting in death, PWID of heroin, conspiracy to commit PWID, and criminal use of communication facility. Relevant to Cesa's issues on appeal, the jury found him not guilty of PWID of fentanyl.

On October 20, 2023, the trial court imposed separate sentences on each count, all to run consecutively, for an aggregate term of nineteen to forty years' imprisonment. Cesa filed a timely post-sentence motion, which the trial

court denied. He then filed a timely notice of appeal. He and the trial court have complied with Pa.R.A.P. 1925.

Cesa presents three issues for our review.

[1.] Whether the [trial] court erred in admitting toxicology results without presenting the testimony of the toxicologist and/or analyst who completed the toxicology testing in contravention of [Cesa's] confrontation rights?

[2.] Whether the Commonwealth failed to present weighty and sufficient evidence to sustain [Cesa's] convictions for conspiracy, drug delivery resulting in death, and delivery of a controlled substance where the Commonwealth failed to establish that: [Cesa] was aware of the nature of the contents of the box; or that the [Victim] died as a result of using a controlled substance delivered by [Cesa]?

[3.] Whether the [trial] court abused its discretion in imposing a manifestly excessive and unreasonable sentence under the circumstances?

Cesa's Brief at 9.

In his first issue, Cesa avers the trial court violated his Confrontation Clause rights by admitting the Victim's toxicology report results, where the analyist who performed the testing did not testify. We consider the relevant standard of review:

"Whether the admission of [a] toxicology report violated [an] appellant's rights under the Confrontation Clause is a question of law, for which our standard of review is *de novo* and our scope of review is plenary."

[T]he Confrontation Clause of the Sixth Amendment is "made applicable to the States *via* the Fourth Amendment" and provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" . . .

- 8 -

*Commonwealth v. Banko*, 268 A.3d 484, 487 (Pa. Super. 2022) (citations omitted and paragraph break added).

Under the Confrontation Clause, "[a]s a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." *Id*. at 489 (citation omitted). A statement is testimonial if it "were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id*. at 489 (citation omitted). In *Commonwealth v. Yohe*, 79 A.3d 520 (Pa. 2013), the Pennsylvania Supreme Court held that a toxicology report, showing the blood alcohol content of the defendant's blood, was testimonial in nature for purposes of the Confrontation Clause. *See id*. at 537.

Finally, we consider Pa.R.E. 703, "Bases of an Expert's Opinion Testimony," which provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Pa.R.E. 703.

On appeal, Cesa avers that in *Yohe*, the Pennsylvania Supreme Court held that a toxicology report is testimonial for purposes of the Confrontation Clause, and thus the toxicologist who authored the report must be available

for cross-examination. Cesa maintains that Dr. Heggere, in performing the Vicitm's autopsy and reaching a conclusion as to the cause of death, relied on the results of a toxicology report, which he did not author. Furthermore, Cesa points out that Dr. Heggere admitted that he did not have experience or education in toxicology. Cesa thus concludes, where the "cause of death was central to the trial," the trial court erred in admitting the toxicology report, whose author was not available for cross examination. Cesa's Brief at 37. Cesa also contends the trial court failed to provide a cautionary instruction, which Pa.R.E. 703 requires. **See id**. Cesa asserts the court's errors were harmful, as the toxicology "report was the only way that [Dr. Heggere] could opine that drugs were the direct cause of the [Victim's] death." **Id**. at 37-38.

At trial, the trial court considered both parties' Confrontation Clause and Rule 703 arguments. It then ruled that under Rule 703, Dr. Heggere could testify about the toxicology report, so long as the Commonwealth "complies with" the rule, by showing an expert in the same "field would reasonably rely on the kind of facts and data, a toxicology report [*sic*], in forming an opinion on the subject, the cause of death of" the Victim. N.T., 8/23/23, at 129-30.

After review of the particular facts presented in this record, we determine the trial court did not err in permitting Dr. Heggere to testify about the toxicology report in rendering an opinion that the cause of the Victim's death was multidrug toxicity. While the toxicology report was arguably testimonial, **see Yohe**, 79 A.3d at 537, we determine Dr. Heggere's testimony

about it was admissible under Rule 703. Dr. Heggere clearly testified that in his field, forensic pathologists routinely rely on toxicology reports, and Cesa did not dispute this. *See* N.T., 8/23/23, at 143. Additionally, the toxicology report itself did not present an opinion as to the Victim's cause of death. Instead, it merely stated the amounts of the drugs found in his body. Dr. Heggere then reviewed this data to reach his ultimate opinion — the cause of the death. Thus, regardless of whether the toxicology report was admissible, Rule 703 permitted Dr. Heggere to testify as to his ultimate opinion. *See* Pa.R.E. 703 (providing that "[i]f experts in the particular field would reasonably rely on . . . facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted").

On appeal, Cesa does not challenge the trial court's ruling based on Rule 703. Instead, his sole discussion of Rule 703 is that its comment requires the trial court to provide a cautionary instruction, but here, the court did not do so. *See* Cesa's Brief at 37. Cesa does not cite, however, the place in the record where he requested such an instruction or objected to the lack of one. Our review of the record reveals he did not. *See*, *e.g.*, N.T., 8/24/23, at 115 (defense counsel stating, "No," when trial court asked if he had any objections or exceptions to the final jury charge). Accordingly, Cesa has waived this particular argument for our review. *See Commonwealth v. Proctor*, 156 A.3d 261, 270 (Pa. Super. 2017) (noting that "[g]enerally, a defendant waives subsequent challenges to the propriety of the jury charge on appeal if he

responds in the negative when the court asks whether additions or corrections to a jury charge are necessary"); **see also** Pa.R.A.P. 302(a) (providing that "[i]sues not raised in the trial court are waived and cannot be raised for the first time on appeal").

Additionally, we would conclude that any error in the trial court's ruling would be harmless. **See Commonwealth v. Brown**, 185 A.3d 316, 330 (Pa. 2018) (stating "[a] constitutional error cannot be found harmless unless an appellate court is convinced beyond a reasonable doubt that the error was harmless," and this Court will find harmless error where, *inter alia*, "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict").

On appeal, Cesa ignores Dr. Heggere's other testimony about the autopsy. We reiterate that Dr. Heggere testified: drug use, and fentanyl alone, can lead to respiratory and cardiac failure; the Victim's lungs and liver were congested; his spleen, adrenal glands, and kidney showed "passive congestion;" and these occur when there is heart failure. N.T., 8/23/23, at 145, 152. "[M]ost importantly," the Victim's brain had swelling, which was typical in drug overdoses. **Id**. at 145. This evidence showed Dr. Heggere had an independent basis, aside from the toxicology report, to support his conclusion as to the cause of the Victim's death. For the foregoing reasons, we conclude no relief is due on Cesa's first issue.

In his second issue, Cesa avers the Commonwealth failed to present sufficient evidence to establish conspiracy and drug delivery resulting in death, because it failed to show: (1) he was aware of the contents of the package; and (2) the Victim died as a result of a controlled substance delivered by him. Cesa's Brief at 48. We note the applicable standard of review:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Burton*, 234 A.3d 824, 829 (Pa. Super. 2020) (citations omitted).

Our Crimes Code defines drug delivery resulting in death in pertinent part as follows:

> A person commits a felony of the first degree if the person *intentionally* administers, dispenses, delivers, gives, prescribes, sells or distributes any controlled substance or counterfeit controlled substance in violation of [PWID, 35 P.S. § 780-

- 13 -

113(a)(30),] and another person dies as a result of using the substance.

18 Pa.C.S.A. § 2506(a) (emphasis added). This Court has explained:

[T]he applicable *mens rea* for [this crime] is two-fold. First, the delivery, distribution or sale of the contraband must be intentional. Second, the actual death must be the reckless result of the actions of the defendant. As such, the crime is an intentional act in providing contraband, with a reckless disregard of death from the use of the contraband.

***Burton***, 234 A.3d at 830 (citations omitted).

Our Crimes Code defines criminal conspiracy in part as follows:

A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime[.]

18 Pa.C.S.A. § 903(a)(1).

This Court has explained:

To sustain a conviction for criminal conspiracy, the Commonwealth must establish, beyond a reasonable doubt, that: (1) the defendant entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent, and (3) an overt act was done in furtherance of the conspiracy. "This overt act need not be committed by the defendant; it need only be committed by a co-conspirator."

***Commonwealth v. Carr***, 227 A.3d 11, 14-15 (Pa. Super. 2020) (citation omitted). "[W]here the existence of a conspiracy is established, the law imposes upon a conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators if

such acts are done in pursuance of the common design or purpose of the conspiracy." *Id*. at 17 (citation omitted).

Finally, we note:

[I]t is well-settled that inconsistent verdicts are permissible in this Commonwealth. . . .

> We note first that inconsistent verdicts, while often perplexing, are not considered mistakes and do not constitute a basis for reversal. Consistency in verdicts in criminal cases is not necessary. When an acquittal on one count in an indictment is inconsistent with a conviction on a second count, the court looks upon the acquittal as no more than the jury's assumption of a power which they had no right to exercise, but to which they were disposed through lenity. Thus, this Court will not disturb guilty verdicts on the basis of apparent inconsistencies as long as there is evidence to support the verdict. . . .

*Burton*, 234 A.3d at 829 (citations omitted).

On appeal, Cesa maintains the Commonwealth failed to show that he "knew the contents of the box Weis asked [him] to deliver to the [Victim]. Weis never told [Cesa] what was in the box, and the box was completely sealed and opaque in a manner that prevented [Cesa] from seeing what was inside." Cesa's Brief at 46. Cesa also avers "[t]he evidence demonstrated that the [Victim] used fentanyl from other suppliers— the stamp bag found in front of [him] which tested positive for fentanyl was not delivered by" Cesa. *Id*. Additionally, Cesa asserts "[t]he Commonwealth's expert was wholly unable to opine to a reasonable degree of medical certainty that the [Victim] would not have died but for using fentanyl which the jury determined [Cesa]

- 15 -

did not deliver." ***Id***. Cesa points out the jury found him not guilty of PWID of fentanyl.[6]

In its opinion, the trial court pointed out that at the time of its writing, Cesa had not procured the trial and sentencing transcripts, impeding its review. Nevertheless, the court reasoned that, based on its independent recollection of the trial evidence, Cesa's weight of the evidence claim was meritless. ***See*** Trial Court Opinion, 7/19/24, at 2. We note the court did not address his sufficiency claim.

Nevertheless, under our standard of review, we determine that the Commonwealth's trial evidence, viewed in the light most favorable to it, that there was sufficient evidence to support the jury's convictions of conspiracy and drug delivery resulting in death. Importantly, Cesa ignores the Commonwealth's extensive evidence from the Victim's phone, as well as

_____

[6] Cesa relies on "these same reasons" to also aver his convictions were against the weight of the evidence. ***Id***. at 47. We remind counsel that the same factual argument does not support both a sufficiency and weight challenge. ***See Commonwealth v. Juray***, 275 A.3d 1037, 1043, 1046 (Pa. Super. 2022) (stating that a claim that the "verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict," and that "a sufficiency of the evidence review does not include an assessment of credibility of testimony offered by the Commonwealth[, and i]nstead, such arguments are more properly characterized as challenges to weight of evidence").

Here, Cesa claims the Commonwealth presented no evidence that he was aware of the contents of the package, and no expert opinion, within "a reasonable degree of medical certainty that the [Victim] would not have died but for using fentanyl." Cesa's Brief at 46. We determine these arguments, the merits notwithstanding, properly go to the sufficiency of the evidence only.

- 16 -

Cesa's prior statements to police. We reiterate that: on the day before he died, the Victim messaged Cesa, that he had $120, the common amount for a bundle of heroin, but later stated he spent $60, and thus Cesa stated he would give him a half of bundle; using Cash App, the Victim transferred $60 to Cesa and $120 to someone named "George Washington," who was under investigation at that time; and the Victim and Cesa exchanged several messages planning a meeting later that day. Additionally, Detective McManus testified that when he went to Cesa's residence to execute a search warrant, Cesa stated that he was expecting the authorities, he **acknowledged providing heroin to the Victim** the day before his death, and he retrieved more heroin from his bathroom and gave it to the detective. **See** N.T., 8/23/23, at 171. Subsequently, Cesa gave a video-recorded statement, in which he admitted: he was aware that Weis had drugs and heroin in his home; Weis gave him a package, made of paper and wrapped with pink or purple duct tape, and asked him to take it the Victim's house; Cesa did not watch Weis prepare the package, but he was aware Weis had drugs in his home, and Cesa was "not stupid or brain dead" and knew "what it was;" and Cesa met the Victim in his driveway and gave him the package. **Id**. at 188-90. In light of the foregoing, the Commonwealth presented evidence tending to show that Cesa was aware that the package contained heroin, and that he gave the package to the Victim. The jury was tasked to pass upon the witnesses'

credibility and was free to believe all, part or none of the evidence. *See Burton*, 234 A.3d at 829.

Additionally, Cesa mis-characterizes Dr. Heggere's testimony. *See* Cesa's Brief at 46 (stating Dr. Heggere "was wholly unable to opine to a reasonable degree of medical certainty that the [Victim] would not have died but for using fentanyl which the jury determined [he] did not deliver"). As stated above, Dr. Heggere clearly testified, within a reasonable degree of medical and scientific certainty, to all of the following. *See* N.T., 8/23/23, at 153. The cause of the Victim's death was multidrug toxicity. The toxicology report showed three drugs, in the "toxic range," in the Victim's blood: (1) 32.3 nanograms per ML of fentanyl; (2) 113.9 nanograms per ML of morphine — which can indicate heroin usage; and (3) 604.6 grams per ML of mitragynine. *See id*. at 144, 148. Fentanyl "is fifty to a hundred times more potent than morphine," its "lethal range is . . . 2.2 to 100," and its "the therapeutic index, the toxic index, and the lethal index . . . overlay [*sic*]. [T]hat means it can kill pretty quickly." *Id*. at 147, 157. Dr. Heggere testified several times that when someone has a fentanyl level of 32.3, it "is very very unlikely [he] will survive," and this alone could have caused the Victim's death. *Id*. at 147, 152. When asked whether the Victim would have passed away if he had not ingested fentanyl, Dr. Heggere responded, "It's difficult to say." *Id*. at 152. On cross-examination, he agreed that he could not say with "certainty that fentanyl alone killed" the Victim, but reiterated, "[I]f you ask me my opinion

which [drug] will definitely kill, if it is . . . alone, [it] is fentanyl." ***Id***. at 161, 163. Furthermore, the Victim had brain swelling, which was typical in drug overdoses, as well as congestion in the lungs, liver, spleen, adrenal glands, and kidneys, which were all typical of cardiopulmonary arrest. ***See id***. at 145.

Again, the jury was free to believe all, part, or none of this evidence, which supported a finding, beyond a reasonable doubt, of Cesa's guilt of conspiracy and drug delivery resulting in death. ***See Burton***, 234 A.3d at 829; ***see also*** 18 Pa.C.S.A. §§ 903(a)(1), 2506(a).

Finally, to the extent Cesa contends the jury's finding of guilt was inconsistent with its acquittal of the charge of PWID of fentanyl, we determine no relief is due. ***See Burton***, 234 A.3d at 829 (stating "that inconsistent verdicts, while often perplexing, are not considered mistakes and do not constitute a basis for reversal").

In his last issue, Cesa avers the trial court abused its discretion by imposing a manifestly excessive and unreasonable sentence. As stated above, the trial court imposed consecutive sentences on all of his convictions, for an aggregate term of nineteen to forty years' imprisonment. Cesa's seven-page Pa.R.A.P. 2119(f) statement avers the "imposition of totally consecutive sentences was unduly excessive[,] especially in light of the court's failure to consider [Cesa's] rehabilitative needs[.]" Cesa's Brief at 25-31. This claim goes to the discretionary aspects of sentence. We note:

> Challenges to the discretionary aspects of sentencing do not entitle a petitioner to review as of right. Before this Court can

address such a discretionary challenge, an appellant must comply with the following requirements:

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

> * * * *

"The determination of what constitutes a substantial question must be evaluated on a case-by-case basis."  Further:

> A substantial question exists only when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process.

*Commonwealth v. Swope*, 123 A.3d 333, 337-38 (Pa. Super. 2015) (some citations omitted).

Additionally, we note: "[T]he imposition of consecutive rather than concurrent sentences will present a substantial question in only 'the most extreme circumstances, such as where the aggregate sentence is unduly harsh, considering the nature of the crimes and the length of imprisonment.'" *Id*. at 338 (citation omitted).  "This Court has also held that 'an excessive sentence claim — in conjunction with an assertion that the court failed to

consider mitigating factors — raises a substantial question.'" **Id**. at 339 (citation omitted).

Here, Cesa has complied with the first three preliminary requirements above: he filed a timely notice of appeal, raised his claim in a post-sentence motion, and included a Rule 2119(f) statement in his brief. **See id**. at 337. Additionally, his claims that the trial court abused its discretion in imposing consecutive sentences, and that it imposed an excessive sentence while failing to consider his rehabilitative needs, raise substantial questions. **See id**. at 338-39.

However, the argument section of Cesa's brief raises slightly different arguments, which we address *seriatim*. First, Cesa maintains: (1) the trial court erred in "admitting a hearsay toxicology report in derogation of [his] confrontation rights;" and (2) "the Commonwealth failed to present sufficient evidence that [he] knew what was in the box or that the [Victim] died as a result of anything [Cesa] supposedly and unwittingly delivered." Cesa's Brief at 48. Neither argument relates to the discretionary aspects of his sentence. In any event, we have determined they do not merit relief.

Next, Cesa presents the following, single-sentence arguments: (1) he contests the consecutive nature of all of his sentences; (2) he provided "myriad character letters in support of his good character at sentencing;" and (3) "the trial court's sentence gives rise to the inference that it punished in response to [his] exercising his constitutional right to a jury trial." Cesa's

Brief at 48-49. He does not present any further discussion of these claims, and thus we determine he has waived them for failure to develop an argument. *See* Pa.R.A.P. 2119(a) (requiring argument to include "such discussion and citation of authorities as are deemed pertinent").

Cesa's sole remaining discussion is that: Weis "was the supposed mastermind behind the transaction; the Victim paid Weis, not Cesa; Weis directed Cesa to deliver the parcel, and Weis "would have conveyed the drugs to the [Victim] regardless of [Cesa's] putative participation." Cesa's Brief at 49. To the extent Cesa argues the trial court failed to consider these mitigating factors, we determine no relief is due.[7]

This Court has stated:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. [T]he appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Mastromarino*, 2 A.3d at 589 (citation omitted).

After review of the record, we determine the trial court did not abuse its discretion. *See Mastromarino*, 2 A.3d at 589. First, Cesa has not cited, and we have not discovered, any evidence of record to support his bald claim that

---

[7] We note that a claim that one's "aggregate sentence is clearly excessive when compared to his co-defendants' sentences" raises a substantial question. *Mastromarino*, 2 A.3d at 589. However, there was no indication in the record of whether the Commonwealth also filed criminal charges against Weis.

- 22 -

Weis "would have conveyed the drugs to the [Victim] regardless of [his] putative participation." Cesa's Brief at 49. Additionally, Cesa again ignores the evidence that: the Victim messaged him on the afternoon before his death, seeking to buy drugs; Cesa negotiated the amount of drugs, based on the Victim's subsequent message that he did not have the full $120; and Cesa admitted to Detective McManus that he gave the Victim heroin and produced more heroin in his house. For the foregoing reasons, we conclude no relief is due on Cesa's sentencing claims.

Having determined that none of Cesa's issues merit relief, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/09/2025